Good morning. Good morning, your honors. If it pleases the court, Gretchen Fusilier on behalf of the appellant, Mr. Hard, Stephen Hard. How do you pronounce your last name? Fusilier. Fusilier? Or, it's close, or Fusilier. I've heard both. How about we go with counsel? Okay. All right. You may proceed. This is essentially the case of an A.B. Utah attorney with no prior criminal background. We got the right judge to come over here. We brought him in just for this case. He brought me in for the hard case. Who has no previous criminal history and essentially was caught up in a very sophisticated, honed fraudster's scheme to defraud CCG partners of a million dollars. I'm going to concentrate essentially on what's been referred to as post-October 20th emails sent by Mr. Hard to CCG. Before we get to the post-October emails, if he was caught up in the scheme, what do we do with the evidence of the assurances that Mr. Hard gave to the, I'll call them the investors, about how he'd previously worked with Mr. Lee and how reputable Mr. Lee was and they'd previously done successful deals? There's no evidence that that was true, is there? Your Honor, I think that the testimony that came from Salazar, essentially Lee, more importantly, and Tobiason were colored by their intention of trying to recoup money because they themselves knew that they may be the target of an FBI misappropriation investigation. But the jury knew all that at the time that they made the credibility determinations and don't we have to view this evidence in the light most favorable to support the jury's verdict? So we have to credit the government's version that Mr. Hard actively assisted in the scheme by making representations to induce the investors to part with the money? If the court looks at Mr. Hard's motion for a new trial that was made, there is a personal background indicating that he had at some point been involved in legal activities relating to leveraging or investments similar to credit defaults. With Mr. Lee?  You know the specific evidence that I'm referring to. Yes, but he had previously had contact with Salazar. So the comments that he made, according to the witnesses, I think that he was caught up in suspended disbelief, I guess, is one way of saying it. Believing that what the accoutrements were that he saw of power, that he indicated he had been in the business for many years, I think that this was perhaps not a criminal participation in a fraud scheme, but more of a puffing on his own part. Counsel, you keep using the word caught up, and I'm having a hard time accepting that characterization of the record. What is most troubling to me is your client's behavior from the very outset of what the government proved at trial was a pretty sophisticated scheme to defraud. And the problem is that it wasn't that he was just representing people as sort of a middleman in the transaction. He was actively assisting Mr. Lee and this fellow in Switzerland in moving the scheme forward. It wasn't a situation where it wasn't until later that he learned that what Mr. Lee intended to do with the money was fraudulent. And the most difficult piece of evidence I think that you have is his conduct well before these e-mails that you wanted to talk about. Well, Mr. Hart was associated with Mr. Lee for an extremely short period of time. He first met him in March of 2004 when he was representing a client and the client had asked him to accompany him. He met and several months later he received a phone call from Bradley asking if he would consider reviewing documents and then was employed as an attorney on a retainer. His relationship with Mr. Lee lasted a short period of time. So he did not have the luxury of a long period of time to discover the fraudulent intent of what Mr. Lee was saying. Why did he tell the investors that they had previously done deals like this before and that they'd all been successful? That simply was not true, was it? Well, as far as the comments that Mr. Lee... That statement, was it true or false? He had not done a previous transaction. So he lied to the investors at the outset of the scheme. Your Honor, I think because of the testimony that Lee gave, how accomplished he was at getting the confidence of people, I think that was... The victims saying, this is what Mr. Hard told us and we trusted him because he was a lawyer. Well, Salazar doesn't really come with clean hands to this transaction. But again, that's a credibility determination and we can't reverse that on appeal and say, well, we don't believe Mr. Salazar, even though the jury did. Well, when we look at the standard of looking at the evidence in the light most favorable for the government, we also have to consider that where there are inferences that may support guilt but are not inconsistent with innocence, obviously it doesn't prove guilt. So when you look... Say that again. I'm not inconsistent with innocence. That's quite a standard. Well, that's the holding of Cox, the case of U.S. v. Cox that I cited. But when you have an intent crime like this, I wonder how you're ever going to convince a court of appeals that when you had a jury listen to the evidence, and Judge Tallman had just said there was evidence, and then they assess credibility and they return a verdict. I don't know exactly what you're suggesting here is the basis for our overturning that jury verdict in a specific intent crime. You're better off almost with murder or something. Then you can prove your innocence later. But here we're assessing the intent, the criminal intent in a fraud case. Your Honor, that's correct. And I think because of the players that were involved, no one really came with clean hands and totaled believability. Mr. Lee did not. Salazar did not, who himself had been caught up in an FBI sting himself at some point, and only because of FBI limited resources was an investigation not conducted, according to FBI agent Embry. However, the jury also heard comments by the government, which took the form of testifying, which we have briefed as prosecutorial misconduct in indicating that leveraging was just something that was made up. It didn't exist. When, in fact, I think most people who keep current know that leveraging exists with the mortgage debt swaps, or the credit debt mortgage swaps, I should say, rather. You think that's a good thing? No, I'm not saying, but it's not illegal. Well, it might be, depending on how you do it. That's correct. Options are a leverage to protect someone's stock position. You can either buy, sell. So I think that when the government inserted its own testimony, that could have colored, and we don't know that that did not significantly impact the jury's deliberation. Well, as I understand it, all the prosecutor says was, he said in closing argument, quote, how are you going to turn $1 million into $100 million magically with no risk? Well, we're going to leverage it. That was his comment. And then he said, the prosecutor said, as hard used the term, leveraging doesn't mean anything. It's mumbo jumbo. Why isn't, I'm having a hard time seeing how that isn't fair argument in the context of this fraud case. In the context of what these guys were doing, it was mumbo jumbo, because it wasn't true. Well, the problem is, is that there was no evidence about leveraging and how it could be conducted. And because this turned out to be one of Bradley's sophisticated scams, if it had been, if it had turned out differently and CCG partners had received money in order to pay back money that they essentially took from their investors without their investors' permission, we would not be here because the leveraging would not have been an issue. Can I ask you this? Is your position that Mr. Hard, Utah attorney, was a victim of Mr. Lee too? I think so. Yes, absolutely. I look very hard at your case, and it seems to me that the big problem in your case is the jury assessed the witness's credibility. So I look for the best case I could find where I overturn the jury's assessment. I couldn't find one. You got a good case for me? Because it seems to me that all these bad guys that you say are bad that testified in your brief, as well as here in argument, were assessed by the jury. And your client was convicted on their assessment. So give me your best case that I have power to question the jury's assessment of a witness's credibility. I mean, I don't find one. I sent my law clerks to find one. I didn't find one. They're not from California. They're only Idaho. But nonetheless, we couldn't find one. And it seems to me that's the bottom line in this case. Your Honor, I don't have a case that has parallel facts such as this one. I didn't find one even close. Well, I'm hoping that there isn't anyone who's close to the kind of character that Bradley is, from his own admission, testifying for the government. We had a lot of times when I was in Idaho and we had these crooks who came in and testified against one another. And the jury had to assess who did what when. And when they got through, we were done. It seems like the same old stuff. Well, certainly this happens often. It's not unique that one of the co-conspirator indictees would testify for the government. However, having said that, I don't think that someone who has laundered tens of millions of dollars, as Lee has had, and has gone around with an entourage with forged documents that look real, from Ben Bernanke saying that he's been extended $500 billion credit, that indicates that presidents invest through him, that have pictures of himself surrounded with soldiers in Iraq, and with documentation. All this was in front of the jury. I understand. That's why I'm saying that. I mean, they had a chance to make that determination, just like you're giving it to me. I understand that, Your Honor, and as I indicated in our brief, the district court judge, when evaluating the merits of a motion for a new trial, should not have – well, should have looked more carefully at – Let me ask you a question on that. What's my standard review of that poor old D.J. who has this motion for a new trial in front of him? It's for harmless error. It's for abuse of discretion. So I've got to find that this is illogical, implausible. There's no way he could have got there. When the jury had all this stuff in front of them, and this is the same stuff you're putting to him, they made a determination, and now he's supposed to just come over the top and say, there you go. Even worse, I'm supposed to go over the top of him, and he didn't do it, and I'm supposed to say, this is so bad, you've abused your discretion. Your Honor, I understand this court's reasoning, and having read all of the testimony as well, and the documentation and the history of the people involved, I feel that the jury got swept up in disliking Bradley so much and assumed that perhaps anyone associated with him doing anything, honest services or not, must have at some level known about the fraudulent intent of Bradley. And I think it's because of that fundamental belief that the verdict came back as it did. Well, you've been in front of me before, and I appreciate your good argument. I'm just trying to put the tougher questions to you, because those are the ones that face me. No, I understand, Your Honor. And, of course, I don't think this is necessarily an easy case for this Court. However, I do think that the merits of the case warrant looking at and evaluating, like the district court judge is mandated to evaluate, the testimony and credibility of the witnesses who testified against Mr. Hard. How do we do that? I mean, that's why the standard is abuse of discretion. We didn't see Mr. Lee. We didn't see Mr. Salazar. We didn't see Mr. Hard testify. The district judge did when he reviewed the motion for a new trial. So he obviously had that as part of the equation, but that can't be reproduced in a written record. That's why we have such a tough standard. Well, Your Honor, for that reason, I have put in, certainly a condensed version, a profile of Bradley in our opening brief to get a flavor of who would believe him. Counsel, that doesn't help us make the credibility determination that you're asking us to second guess. Well, I think that in one's everyday logical, reasonable, rational world, if we were to encounter someone and we knew that it was a person of Bradley's character, I don't think we would put much stock in what he had to say. That may be true, but the jury apparently believed him. And perhaps the jury didn't evaluate him in that light, and they should have because it seems irrational to have believed everything that he said. But I would like to reserve that. You are over time, but I'll give you a little bit of rebuttal. Thank you. All right. We'll hear from the government. Thank you, Your Honor. And may it please the Court, I'm Stephen A. Stryker on behalf of the United States. Okay. You're going to have to help me with your A. Stryker? It's A. Stryker, yeah. Even though it starts with an O. Okay. It's a tough one. We'll stick with counsel. Thank you. Okay. Mr. Hart's reply brief at page 3, he says that he's not challenging the credibility of the witnesses. But I think most of what we just heard was that he was. We haven't found any cases either that permit that. And what's more important is that the jury, as Your Honors have pointed out, the jury heard Mr. Lee testify and the jury heard everyone else testify. And Mr. Lee's testimony fits together with the rest of the evidence in the case. Counsel, it's been my experience in trying any number of cases with sleazy witnesses on both sides that the jury pays a whole lot of attention to the documents, the e-mails, basically anything that doesn't require a live human being that they have to assess the credibility of. And then they ask themselves, does this fit with the story that the questionable witness is saying? And apparently that's what the jury satisfied itself with when they convicted Mr. Hart. Exactly. And we think the same. And Mr. Lee was cross-examined at great length by the defense about his prior criminal conduct. He was cross-examined about his possible motivations for lying. And the district court gave an instruction that said you should consider Mr. Lee's testimony more carefully than other witnesses because of his cooperation with the government. And as to – I think Judge Benson asked a question about the consistent with innocence standard. We don't think that is the standard. The Neville's case is – it's an in-bank case from this Court, a very recent case. It wasn't consistent with innocence. I thought she said not inconsistent with innocence. Right. There were a couple of – there was a double negative in there. Right. Whichever one of those it is, that's not the inquiry. The inquiry is if it's consistent with both innocence and with guilt, it's for the jury to decide, so long as that wasn't irrational. And we think on the facts of this case it wasn't irrational because, as Judge Tallman mentioned, the testimony fit together with the e-mails and so forth. Why didn't the district court give the requested instruction on conspiracy? Why didn't he? Yeah. I don't think – I mean, that instruction wasn't that bad. I didn't think it was outlandish. I felt it felt like it was according to the evidence. So why didn't they do it? Well, to be clear, Mr. Hart didn't request the instruction that he's now saying the district court should have instructed on. He asked for the pattern instruction. So we've actually in our brief have argued forfeiture. I think you could even go further than that. He might have just invited the error that he now is claiming existed. So I don't think you need to resolve that. It's clear under Rule 30D that he didn't preserve the issue by objecting after the fact. As to the alleged prosecutorial misconduct in the argument or the remark about leveraging, the prosecutor wasn't making a broader point about leveraging writ large or the investment strategy of leveraging. The prosecutor in context was making a point that there was no leveraging in this case. It was mumbo-jumbo. And the district court in ruling on the pro se motion for new trial made that observation. And we think that this would – even assuming this was somehow improper, which it wasn't because it was backed up again by Mr. Lee's testimony. Mr. Lee said, no, leveraging in this case was just a made-up fraud term. That's the term that all the crooks use in cases like this. Even then, it wouldn't matter. It wouldn't be prejudicial. And it certainly wouldn't be obvious error or plain error, which is the standard. And I don't think Mr. Hart disputes that because he didn't object to this remark at the time. But it wouldn't matter because this goes to whether there was a fraud. Mr. Hart today and in his briefs says there was a fraud. He acknowledges that there was a fraud. He just says he didn't know about it. He doesn't ever really come to grips with that there wasn't – he doesn't – excuse me. He doesn't dispute that there was no leveraging in this case. He says, I didn't know. I didn't know that at the time. So if Your Honors have any further questions about any particular – whether the instructions are sufficiency. I don't. We would just rest on our briefs. Thank you very much. Thank you. Counsel, I'll give you a minute for rebuttal. I'm not sure you have much to rebut there. Your Honor, just briefly, you mentioned that with the cast of characters that Sleazy is apparently – has been assessed of the ones in this particular case, the jury would look at documents. Well, I think that looking at the documents, our position is we have briefed in our opening brief and addressed also in the reply brief the post-October 20th emails we don't believe fits the definition of the proper kind of mailing as envisioned by 1341 under the fraud statute. Because it had – all of the mailings were sent after fruition. And if we look at all of the cases. But isn't that also a question of fact? I mean, our cases have recognized that efforts to lull the victims in order to forestall discovery of the scheme to defraud while the proceeds are being spent in order to stave off the investigation and discovery of the fraud can be considered part and parcel of the scheme, haven't we? Haven't we recognized that? If it's considered an appropriate mailing under the statute. No, we're talking just acts in furtherance of the scheme. It doesn't have to be a mailing that would be chargeable as a separate substantive offense, does it? No, it doesn't. But in this instance, it was not in furtherance of the conspiracy because the conspiracy had reached fruition as defined in Evans, a point at which the funds were – Your argument is the conspiracy ended when the funds were delivered. But that's not the government's theory and that's not what the jury heard at trial. But that is consistent with the cases. If we look at Evans, if we look at Schmuck, if we look at Lowe, if we look at Lane, all of those cases indicate that once fruition has been accomplished, any mailings thereafter are not in furtherance of the conspiracy. Well, but that's the question we have to decide is whether or not on this record the conspiracy ended when the funds were delivered. Well, based on Evans, if fruition is the point at which the funds or property reach the intended person, fruition has occurred. But that's not what the indictment charged, counsel. The indictment charged that the emails were in furtherance of the scheme to defraud by forestalling the victims from discovering that they had been victimized while the perpetrators spent the proceeds and kept the barking dogs of the FBI away. But that was not proven because – Well, I mean, that was the government's theory as the grand jury charged and that was the evidence that the jury heard and the jury convicted. So the question I think you're asking us to decide is as a matter of law, notwithstanding the allegations in the charge and the proof in conformance at trial, as a matter of law, the conspiracy had to have ended when the funds were imparted. And that's consistent with the cases. And although the government took the position that it was lulling to delay discovery, there was no delay required because they already had their former FBI, who was their liaison to the FBI, involved before they got into this transaction. But I ask just so I understand this. Are you saying the judge, when the evidence was presented on these emails post-completion, that the evidence shouldn't have been allowed at all? That's correct as lulling. And the instruction was, well, the evidence – Don't you think that informs someone's intent? No, the evidence – Whether they try to convince somebody to stick with this. The evidence at trial was that they were trying to draw it out so that maybe Mr. Lee, the fraud artist that he was, could have found some other way to make some money and pay him back. And that doesn't inform criminal intent? The evidence was admissible. But the instruction as far as lulling, we are challenging. And the reference to them as lulling to delay discovery, that was not the reason, according to the evidence, that they delayed going to the FBI. They delayed going to the FBI because they knew they may very well be the subject of an FBI investigation themselves. I would submit it on that. Counsel, thank you. Thank you for your argument. The case just argued is submitted.
judges: Benson, Tallman, Smith